S. LANE TUCKER
United States Attorney

MICHAEL J. HEYMAN
SETH M. BEAUSANG
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-1523
Email: michael.heyman@usdoj.gov
Email: seth.beausang@usdoj.gov


Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GARRETT ELDER,<br><br>Defendant. | 3:23-cr-00020-JMK-MMS |

SENTENCING MEMORANDUM

The United States recommends imposition of the following sentence:

**INCARCERATION**................................................................**87 MONTHS**
**SUPERVISED RELEASE**..............................................................**3 YEARS**
**SPECIAL ASSESSMENT**.................................................................**$100**
**RESTITUTION (MANDATORY)**................................... **$26,046,011.61**
**FINE**.................................................................................................**$0**

## I. FACTUAL SUMMARY

Defendant Garrett Elder perpetrated what may be the largest investment fraud scheme on Alaska residents – by an Alaskan – in Alaska history: Over $26,000,000 stolen from *at least* 177 victims. Victims ranged from a 10-year-old boy who invested with Defendant the $120 he earned doing chores to the elderly who entrusted Defendant with the nest egg that took a lifetime to earn and moments to lose. They were his close family members, best childhood friends, members of his church community, and anyone he could con with his charisma. Defendant's conduct was despicable, the impact incalculable.

Defendant executed his scheme between approximately 2016 to October 2022. During that period, Defendant convinced individuals to transfer funds to him for investment in stocks and foreign currencies on their behalf through deceptive – and often flagrantly false – representations about his trading methods and historical returns from the investments. Although the scheme developed through multiple entities over a few different phases, the core plan was simple -- continue to charm investors out of millions of dollars in new investments through a calculated system of lies, all while losing whopping amounts of money on trades and thievery. In the words of some victims:

- *"It is unimaginable how someone could deliberately inflict pain like he has inflicted on me and many, many others…"* Sealed Dkt. 45 at 18.

- *"Garrett preyed on relationships"* and *"cultivated relationships only for what he could take from them."* *Id*. at 6.

- *"The emotional toll is horrible. Unthinkable."* *Id*. at 103.

- *"I am shocked and discouraged. I am hurt by the bold, careless hubris that could so callously bamboozle trusting people in this way."* *Id*. at 100.

- *Defendant "ruthlessly preyed upon our trust and friendship... the depths of his deceit are staggering, leaving us with a sense of betrayal that is hard to put into words."* Sealed Ex. 1 at 2.

- *Because of Defendant's actions, "Often I find myself slipping into despair and thinking how easy it would be if I just didn't have to face another day."* Sealed Dkt. 45 at 87.

Defendant wrecked the lives of dozens of vulnerable Alaskans and severely impacted the lives of many more. He lived like a celebrity at the expense of many who will never recover. Defendant should be sentenced to 87 months in federal prison following by the maximum term of supervised release to reflect the immense harm Defendant caused, provide just punishment for his crimes, deter others from engaging in similar conduct, and ensure that the Defendant does not do this again.

## II.    GUIDELINES CALCULATION

The PSR calculated the total offense level as 30. The base offense level for this wire fraud conviction is seven. Twenty-levels were added for loss between $9.5 million and $25 million [§ 2B1.1(a)(1)], plus another six-levels for substantial financial hardship to 25 or more victims [§ 2B1.1(b)(2)]. Three levels were subtracted for acceptance of responsibility and timeliness [§ 3E1.1(a) & (b)]. This results in a total offense level of 30. Sealed Dkt. 46 at ¶¶ 13-22.

The parties agreed that the total offense level for this offense is 30 and additionally agreed to a variance under § 3553 equivalent to a one-level Guidelines departure, resulting in a total offense level equivalent to 29. Dkt. 30 at 13. With a criminal history category of I, Defendant's sentencing range as set forth in the plea agreement (including the variance under § 3553) is 87-108 months.

## III. STATUTORY CRITERIA AND RECOMMENDED SENTENCE

### 1. Nature and circumstances of the offense

The nature and circumstances of this massive fraud weigh heavily in favor of an 87-month sentence.

### A. __General Background__[1]

Beginning in 2016 and continuing until October 2022, Defendant executed a scheme to defraud approximately $26 million from *at least* 177 victims.[2]

Defendant's scheme involved soliciting individuals to transfer funds to him for investment in largely foreign currencies on their behalf. In soliciting these investments, Defendant engaged in a deceptive and misleading scheme to defraud and made material misstatements and omissions about his trading methods and returns from the investments he made on behalf of investors. Defendant admitted that, among other material misstatements and omissions, he gave investors the impression that he was a successful trader and often told investors that he used a conservative trading approach that would yield positive returns on their investment. He then provided investors falsified account

---

[1] The background facts are set forth in Sealed Dkt. 46 at 1, ¶¶ 1-2; 8-9, ¶¶ 5-8 and the plea agreement, Dkt. 30 at 4-7.

[2] While 177 victims are identified for restitution purposes, the exact number of people negatively impacted by Defendant's conduct is considerably higher. For example, a single victim counted for restitution purposes may have multiple minor dependents not counted individually, despite the significant impact on the minor family members. In another example, one victim financially supported a disabled adult family member, but will no longer be able to do so. Sealed Dkt. 45 at 90. The family member is similarly not included as a restitution victim, although the impact is substantial. Thus, while there are 177 victims for restitution payment purposes, the total number of people suffering from Defendant's fraud is substantially higher.

*U.S. v. Elder*

statements ostensibly confirming these positive rates of return. In total, the investigation revealed that Defendant falsely claimed to his investors that they had made over $11 million dollars in non-existent profits. In fact, however, Defendant had been consistently losing money for years. Rather than follow a conservative approach, Defendant admitted that he attempted to make up for prior losses with larger and riskier trades resulting in what the investigation determined to be approximately $20 million in trading losses. The remainder was lost on a lavish lifestyle, commissions and other payments to business associates, asset purchases, gifts, and other expenses.

## B. The Creation of Tycoon Trading, LLC, and Initial Losses

Defendant's interest in trading began in his high school finance class. He continued this interest while at the University of Alaska, Anchorage ("UAA").

In September 2012, Defendant created an entity called Tycoon Trading, LLC ("Tycoon Trading"). Defendant created Tycoon Trading for the purpose of executing buys, sells, and short sells of equities, options, foreign exchange, and futures. Defendant's parents provided to Defendant $20,000 as an initial investment and for additional education. Defendant and his brother lost all the initial seed money.

After losing the initial funding, Defendant returned to UAA and graduated in 2014 with a bachelor's degree in finance. Post-graduation, Defendant consolidated Tycoon Trading into a single member LLC and received another $10,000 to $20,000 from his parents. Defendant again lost all of those funds trading equities and foreign currencies.

//

//

### C. The First Round of Investors and Losses

Despite the losses, Defendant told his family, friends, and others about his trading business, and some expressed an interest in investing. Defendant did not disclose his trading losses but, instead, touted a conservative trading method and gave these victims the false impression that he was a successful trader.

Based on these omissions and false impressions, Defendant described that between 2016 and March 2018, friends, family, and others (totaling about 13 investors) transferred approximately $500,000 to Tycoon Trading for Defendant to invest on their behalf. For a second time, Defendant began losing money and accelerated the rate of losses by larger trades. At one point, Defendant stated he traded 50% of all the investors' funds in a single trade, a trade that failed. Notwithstanding the losses, Defendant admitted that he created false quarterly performance reports that he emailed to his victim investors stating that the investments were earning strong positive returns.

By March 2018, Defendant stated he had lost almost all the victims' money and had only approximately $10,000 to $15,000 left in his trading account. In March 2018, Defendant disclosed to the victims that their investments had failed but did not disclose that he falsified the quarterly performance reports he had sent to them.

### D. The Second Round of Investors and Losses

Meanwhile, notwithstanding the near total losses, Defendant continued to seek new investors, claiming to be a successful trader. The number of people investing grew substantially and the total amount invested grew into the millions.

//

In June 2020, Defendant created an entity called The Daily Bread Fund, LLC (the "Daily Bread Fund"). The Daily Bread Fund was designed to buy, sell, and/or otherwise trade in the foreign (non-U.S.) currency exchange markets.

From 2019 through 2022, Defendant continued to solicit new investors through Tycoon Trading and the Daily Bread Fund, claiming to be a successful trader and paying distributions to investors that requested them to provide the appearance of investment successes.

The plan worked. Defendant successfully solicited significant new investments. The number of people who had invested with Defendant grew to approximately 177 with deposits of over $28 million dollars since March 2018.[3]

However, in reality, Defendant continued to consistently lose money trading. Despite continued mounting losses, Defendant maintained his practice of creating and emailing to investors false reports indicating positive returns and building/reinforcing the illusion of success and happiness. The below screenshots are examples of emails that Defendant sent to specific investors. The first email sent on April 5, 2021, reads, in part: "Happy April! March was a relatively quiet month in the markets, but we still managed to squeeze out a decent return…. Wishing you a happy Monday from Maui." The lie is followed by a photo of Defendant with his wife and child to add a personal touch and reinforce the perception of success.

---

[3] By this point, Defendant had grown Tycoon Trading which had five business associates trading under his banner and an Anchorage office located at 7120 Old Seward Highway.

*U.S. v. Elder*
3:23-cr-00020-JMK-MMS                    Page 7 of 29



The next sample email similarly misrepresents investment successes and

perpetuates the fiction, stating:

> It's been a bit slower the last few months trading with lots of uncertainty and volatility in the market with Russia/Ukraine, along with some rising interest rates. Fortunately, I've stuck to the trading plan, and it has managed to still churn some profits. I guess that's the beauty of working a time-tested system and strategy, because then all I have to do is show up and do my job. On a fun note, I managed to get away for the weekend and go skydiving with some friends for an overdue Christmas present….



It was a sordid plan. One victim said, "I felt angry at the manipulation that was

done using cute family photos to try to show an innocence and well-meaning goodness

when there was flagrant dishonesty behind the facade." Sealed Dkt. 45 at 100.

Despite the façade, by October 2022, Defendant had lost approximately $20

million of investment funds through his trading.

### E. **Mizuna Entities and Fraud on Business Associates**

While Defendant was primarily defrauding people through Tycoon Trading and the Daily Bread Fund, those entities were not the exclusive vehicle for the fraud.

####    1)    Mizuna Entities

In 2021, Defendant created Mizuna Matata LLC and Mizuna Capital LLC (together, "Mizuna"). The entities were created with a new business partner, J.T., who would act as the fund manager. Defendant established these entities for the purpose of providing his investors with a new well-organized and managed trading structure and to take advantage of any new investors that J.T. could attract. J.T. would be the manager, but Defendant had full authority to trade utilizing Mizuna funds. Much like the false representation to his own investors, Defendant similarly misrepresented his trading successes to J.T. and provided false documents to support the lies. J.T. and Defendant then solicited and raised approximately $1.4 million in new investments in part based on Defendant's purported experience and fraudulent reputation for successful trading.

Over the ensuing months, Defendant continued to execute trades on behalf of the Mizuna investors and experienced similar heavy losses. From the opening of Mizuna until the beginning of October 2022, Mizuna investors lost approximately $455,000 of the $1.4 million invested. To address the losses to the Mizuna investors and in hopes of preserving his relationship with J.T., in June and July 2022, Defendant transferred approximately $317,000 in other investor funds to credit Mizuna investors. Nonetheless, Defendant lost a total of approximately $772,000 trading for Mizuna investors.

//

On or about October 2, 2022, Defendant notified J.T. of the fraud, including that Defendant had falsified financial records.

2)  Fraud on Business Associates

Defendant entered into a business relationship with other individuals ("Traders") who wanted to learn foreign exchange trading from Defendant. Some made substantial changes to their life to pursue the success Defendant falsely presented. One quit his job, moved his family to Anchorage, and invested his and his wife's retirement funds and most of their life savings to trade under Defendant's guidance. These individuals were not employees, but independent investors who primarily invested their own funds (with some smaller contributions of investor money from Defendant), learned trading techniques from Defendant, and utilized Tycoon Trading brokerage accounts and resources. In exchange for Defendant's expertise, the office space, and trading account platform, Defendant was to receive a percentage of their profits. Without consulting the Traders, however, Defendant surreptitiously converted their authentic live trading platforms to demonstration platforms, *i.e.*, teaching platforms that did not utilize actual funds. Defendant then used the Traders' money to make real trades himself. When a Trader wanted to withdraw funds, Defendant sent the money to that Trader out of investor funds. In total, the Traders' payouts typically exceeded their investments, although one Trader lost almost his entire investment.

//

//

## F.    The Stealing and Squandering of Assets

While Defendant was fraudulently eliciting investment funds and losing a substantial portion of those funds on trades, Defendant was also stealing and squandering millions.  Defendant used investor funds on personal expenditures, including real estate investments, vehicles, a boat, a camper, private jets, gifts, gambling, and luxurious vacations. It was a lavish lifestyle supported by investor deposits.  For example, Defendant spent approximately $250,000 of investor money on private jet flights to such places as Hawaii and Colorado.  Defendant spent approximately $115,000 of investor money on vacation lodging and resort rentals such as a large house on the beach in Maui.  He also travelled internationally to Mexico (Cabo San Lucas), Grenada (multiple times), British Columbia (Whistler) and to numerous other states for multi-week motorcycle rides and recreational vehicle trips.  By his own admission, Defendant lost between $80,000 and $160,000 on in-person and internet gambling.  Defendant also "donated" freely with the investors' money.  He donated approximately $190,000 for religious mission support, approximately $40,000 for Iron Dog sponsorship and race sleds, and approximately $60,000 in two large gifts of money and a Toyota Tundra vehicle.  He further purchased numerous personal and real property assets, including a $660,000 vacant lot on Glenn Alps Road, an $86,000 Ford F350, a condominium, a $50,000 boat, a $49,000 camper trailer, thousands of dollars in bicycles (fat-tire, e-bike, mountain) and several other personal property items.  Additionally, throughout the time frame that investigators reviewed, Defendant had approximately $1 million dollars of credit card purchases paid for, in part, with investor funds.  Defendant also paid expenses such as approximately $55,000 in office

rent since March 2020, approximately $560,000 in payments to the Traders that exceeded their investments, approximately $300,000 in salary to one employee, and approximately $175,000 in net commissions and fees to a business associate for investor referrals and other services.[4]

Below are some photos highlighting Defendant's lavish lifestyle:

- Private plane that Defendant rented to fly him, his family, the Traders, and their families to Hawaii for vacation.



- Moonlight cruise boat that Defendant rented while in Maui, Hawaii for him, his family, the Traders, and their families.



---

[4] The relevant financial records contain thousands and thousands of transactions. The above narrative is intended only to provide examples of larger categories of expenditures; nor are the amounts identified exact but estimates obtained from the available data.

- Helicopter that Defendant rented to fly him and others to Anchorage after dip netting on the Kenai Peninsula.



- Boat and camper.

 

- Exotic performance cars rental at a private racetrack in Las Vegas.



The United States seized or received through the forfeiture process the following assets from Defendant, all of which were purchased, in whole or part, with stolen investor money or were otherwise criminal proceeds.[5]

| ASSET | APPROXIMATE PURCHASE PRICE | AMOUNT RECOVERED |
|---|---|---|
| Wells Fargo Bank Account x5109 | - | $349,801.32 |
| Wells Fargo Bank Account x5026 | - | $29,661.33 |
| Wells Fargo Bank Account x8793 | - | $351.22 |
| Alaska USA Bank Account x061 | - | $15,156.23 |
| 37 Acres of Vacant Land on Glenn Alps Road | $660,000 | $TBD |
| 2021 Ford F350 | $86,000 | $TBD |
| 2021 Heartland Prowler Camper Trailer | $49,000 | $TBD |
| 2022 Alweld Boat | $50,000 | $TBD |
| Condo at King Arthur Circle | $218,000 | $86,089.82 |
| Aspen & Birches LLC Interest | $75,000 | $10,000 |

## G.    The Scheme's Collapse

Despite massive losses from trading and the diversion of assets, the scheme did not reach an inflection point until August 22, 2022, when a certified public accountant retained by one of the investors recognized irregularities with Defendant's operations and reported his concerns to Alaska state regulators. In late September 2022, state regulators notified

---

[5] Many assets have been seized but are not yet liquidated. Amounts recovered may vary significantly from the purchase price depending on the ultimate sales price and lien amounts.

Defendant that he was under investigation.

Upon learning of the investigation, Defendant disclosed his fraudulent activities to a few close individuals. As word of the fraud began to spread among investors, certain investors began filing complaints with law enforcement and regulators. But, until the end, Defendant was still soliciting new investors, including the widow of a retired military officer who died from cancer. The victim invested a large portion of her husband's death benefits with Defendant approximately two months prior to the scheme's collapse and Defendant tried to convince her to invest the remainder with him instead of paying off her house. In September 2022 alone, defendant obtained over $3 million dollars in investor funds, but had lost/diverted nearly all investor funds by the date that state regulators notified him of the investigation.

On October 10, 2022, Defendant met with the federal investigation team, admitted his guilt, and agreed to fully to cooperate with law enforcement.[6]

On May 22, 2023, Defendant pled guilty to violating 18 U.S.C. § 1343 (wire fraud), including an admission that he perpetrated an expansive fraud beginning in early 2016 until October 2022, all of which is relevant conduct for this sentencing.[7] *See* Dkt. 30 at 4-7.

---

[6] In the ensuing months, law enforcement dedicated thousands of hours to the investigation, including reviewing the contents of Defendant's computer, interviewing scores of witnesses, asset analysis/recovery, and reviewing/analyzing thousands of pages of financial records, including those received pursuant to approximately 40 grand jury subpoenas from banks/credit unions, trading platforms, mortgage companies, etc.

[7] All of Defendant's conduct is relevant in determining the appropriate sentence. *See* Guidelines § 2B1.3l; *United States v. May*, 706 F.3d 1209, 1213 (9th Cir. 2013)("Because relevant conduct may include a broader range of conduct than the underlying offense conduct, a district court may properly consider charged, uncharged, and acquitted *U.S. v. Elder*

## H.    Victim Impact

The toll on victims in this case is incalculable.  Defendant caused substantial financial hardship to dozens of victims and severely impacted the lives of many more.  *See* Sealed Dkt. 46 at 9, ¶ 9; Sealed Dkt. 45.

Many victims' financial life plans were upended by Defendant's fraud.  Some elderly victims lost substantially all of their savings from a lifetime of work with no prospect for recovery.  Sealed Dkt. 45 at 18-19, 86-88, 100, 103-104.  Their new economic reality is bleak.  Other victims nearing retirement age will now have to delay retirement plans and work additional years, in some cases more than a decade of additional work to ensure generating sufficient funds to last through their eventual retirement.  *See id.* at 2, 4, 5, 9, 12-15, 22, 49, 51, 89-90, 92, 97-99, 102, 105-106.  Some victims were compelled to make major, life-impacting decisions such as quitting a job, selling a business, and moving their homes based on the Defendant's conduct.

Victims' family relationships have also been strained.  For example, one victim can no longer financially support a disabled sibling.  *Id.* at 90.  Some parents and grandparents have lost the ability to assist with their children's college expenses as planned.  *Id.* at 20, 90, 91.  Another victim was planning to stop working on the North Slope, find a job in

---

conduct." (Internal quotations and alteration omitted)); *United States v. Head*, 2020 WL 4059577, at *3 (E.D. Cal. July 20, 2020)("a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence…." (citing *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008); *United States v. Shaw*, 2022 WL 636639, at *1 (9th Cir. Mar. 4, 2022), cert. denied, 2023 WL 4278459 (2023)(acquitted conduct is "part of the § 3553(a) sentencing factor analysis" even if not considered "relevant conduct" under the Guidelines).

Case 3:23-cr-00020-JMK-MMS    Document 52    Filed 11/01/23    Page 16 of 29

Anchorage, and spend more time with his family, but the victim will now have to continue working remotely. *Id*. at 93. One victim who had been stay-at-home caretaker of children must now work outside the home to make up for the losses incurred by Defendant's scheme. And those are just the secondary financial-related ramifications.

In addition to the monetary impacts, victims' mental and physical health have also been adversely impacted. Many have suffered lasting feelings of self-doubt, shame, guilt, anger, anxiety, depression, embarrassment, and other negative impacts to their mental well-being. Some have described the violation of trust they had in the Defendant as painful and lasting. At least one is now dealing with hypertension due to the anxiety and another has expressed thoughts of suicide. *See*, *e.g.*, Sealed Dkt. 45 at 5-6, 10-12, 16, 18-19, 87, 91, 103.

Moreover, the likelihood that victims will ever be made financially whole is exceedingly low. Even with a full restitution order in the amount of $26,046,011.61, Defendant is presently unable to pay any portion of the restitution (except in the event and to the extent that forfeited assets set forth in the table above may later be available to satisfy restitution), will likely only pay a negligible amount toward restitution while imprisoned, and will only be able to make relatively small payments over the course of many years upon his release from custody. Given the situation, elderly victim recoveries will likely be relatively minimal. For the remainder of the victims, the aggregate distribution over the years will probably compensate for only a small fraction of actual financial losses (*e.g.*, current loss amounts plus interest, inflation, lost opportunities, etc.).

//

The nature and circumstances of Defendant's conduct are, therefore, extraordinary. Defendant bilked a huge amount of money out of 177 investors for around six years.

## 2. History and characteristics of Defendant

Defendant's history and characteristics militate in favor of an 87-month custodial sentence.

Defendant is a well-educated and savvy businessman. He was valedictorian of his high school class and received a full college scholarship, eventually graduating from UAA with a bachelor's degree in finance. He gained early practical experience flipping houses with his father and was active in his church community. He came from a comfortable background and was provided every opportunity for honest success. Defendant did not commit his crime out of necessity, and he was not suffering from financial distress. Nor was Defendant' criminal conduct the result of impulse. Instead, he utilized his otherwise impressive talents over the course of six years to create a fantasy of financial success and satisfy his greed at the expense of his victims.

## 3. The seriousness of the offense and just punishment

Defendant's crime is among the worst, if not the worst, investment fraud schemes ever perpetrated on Alaska residents – particularly given the number of vulnerable victims and magnitude of losses. He told numerous lies and stole, in aggregate, approximately $26 million from 177 victims in amounts ranging from a few thousand dollars to over $1 million per victim.

Defendant's crimes were not an isolated mistake. They involved a persistent and well-conceived course of conduct over the span of about six years. He created a fake

persona and reputation of being a successful trader and then layered on his innate charm and unsettling capacity for telling lies to ensure that the investments kept flowing. Moreover, Defendant did not just push lies through impersonal marketing materials or a website but, in many cases, sat in people's living rooms, looked victims in the eyes, and lied about why they should trust him with their money.

He also stole without any consideration for the impact of his actions on his victims. He stole from anybody he could, including minors, the elderly, church community members, and close family and friends. The extent and effectiveness of his deceit is disturbing.

And the full impact of Defendant's crimes is incalculable. Defendant caused millions of dollars in direct economic harm, plus the fallout to countless other people such as minors whose college educations are in question, the many victims on the verge of or already in retirement compelled to work for several more years, the many victims required to take second jobs, significant amounts of time and money incurred in taxes and penalties from IRA withdrawals and legal/other professional fees, etc.

In addition, the harm is not solely economic. It is not just about money. Defendant inflicted tremendous psychological and emotional harm to numerous victims and their entire families. These sleepless nights, anxiety, and other harms are described in painful detail in the numerous victim impact statements already submitted to the Court under seal as well as the likely oral statements that will be made during the sentencing hearing.

Defendant wrecked lives. The sentence must reflect the seriousness of his conduct.

### 4. Adequate deterrence

Deterrence – both specific and general – is a significant factor that supports an 87-month sentence in this case.

### A.    <u>Specific Deterrence</u>

An 87-month custodial sentence is needed to ensure that Defendant's fraud rampage is over and that he is never tempted to consider new scams.

First, Defendant had multiple chances over the span of six years to acknowledge his wrongdoings but, instead, elected to commit more and more fraud.  After initially losing his parent's seed money, he lied to obtain the funds from third-party investors.  Then, after losing that round of investments, he lied to obtain another round of investments from a much larger pool of investors and even more money.  He could have stopped at any of these pivotal moments, but the plot continued in a single trajectory of more and more fraud until the scheme finally collapsed.  Theft and trading losses wiped out the funds and there was no path to replace the millions lost.

Second, Defendant did not plot his course blindly.  He was calculated and skilled.  He knew that investors expected meaningful returns and crafted the manipulation to satisfy the expectations while giving the general appearance of legitimacy, *e.g.*, ostensibly recognizing that the markets were down and then bragging about modest gains during the down period.

Third, Defendant was callous and his talent for deceit is chilling.  Defendant preyed on numerous vulnerable victims and showed no signs of contrition.  Even as he was contemplating turning himself into law enforcement, he was attempting to convince a

widowed victim to invest the remainder of her husband's death benefits. While contrition may have played some role in his ultimate decision to contact law enforcement, the driving force was his realization that continuing the scheme was impossible.

Last, even after admitting guilt to investigators, Defendant took concerning actions. From December 2022 through March 2023, Defendant raised about $20,000 selling personal property such as bikes, tools, and office furniture and earned additional funds from a snow removal job.[8] While not illegal, Defendant utilized those funds along with credit cards in two troubling ways: He paid a third party to develop trading software which he expected would enable him to become a successful trader. He then paid approximately $22,000 to two companies in order to test the software on their demo platforms. It appears that the venture failed. Regardless, Defendant continues to make risky financial decisions, decisions that could easily create a temptation for abuse or, at the very least, deprive victims of their restitution.

Defendant must be deterred.

### B.    General Deterrence

General deterrence is crucial in this case. General deterrence is especially important in white collar cases where prison sentences can have a significant impact in deterring others from engaging in financial crimes. Cases within the Ninth Circuit and throughout the country have recognized this impact. The primary reasons that substantial prison sentences are impactful is because white collar criminals typically make rational and

---

[8] Since approximately November 2022, Defendant has been employed by a snow removal and landscaping business.

Case 3:23-cr-00020-JMK-MMS   Document 52   Filed 11/01/23   Page 21 of 29

calculated decisions, including weighing the prospect of potential incarceration against the potential economic gains.

The Ninth Circuit recognizes "that prosecution may carry enhanced value as a means of general deterrence where, as here, the alleged offense is a white-collar crime…" *United States v. Slavin*, 2022 WL 576016, at *2 (9th Cir. Feb. 25, 2022)(citing *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)("[b]ecause economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") and *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018)(recognizing that Congress, in adopting the Sentencing Factors at 18 U.S.C. § 3553(a), determined general deterrence to be "particularly important in the area of white collar crime")). "White collar criminals may be particularly susceptible to general deterrence because '[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment.'" *Sample*, 901 F.3d at 1200 (10th Cir. 2018)(internal citations omitted); *see also Slavin*, 2022 WL 576016, at *2 (9th Cir. Feb. 25, 2022); *United States v. Swenson*, 2020 WL 7847204, at *2 (D. Idaho Dec. 31, 2020)(white collar defendants "are more rational, deliberate, purposeful, nonimpulsive, and calculated."). The Guidelines also explain the need for general deterrence. Commentary to § 2T1.1 (relating to tax fraud) states that "as the potential benefit from the offense increases, the sanction necessary to deter also increases."

In addition, lucrative financial crimes often occur over long periods of time and can be difficult to detect. *See United States v. Morgan*, 635 F.3d. Appx. 423, 450 (10th Cir.

2015)(failure to impose significant consequences in white collar crimes "creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.")(citing S.Rep. No. 98–225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014)("In a number of opinions… we have explained that general deterrence is an important factor in white collar cases, where the motivation is greed.").

Here, a lengthy sentence is necessary to deter others from engaging in economic frauds. This criminal case has and will likely continue to receive significant media attention due to the scope of the fraud and impact on Alaska residents. The "rational, cool, and calculated" people considering financial crimes watch and read this news. Without a significant custodial sentence, those considering economic frauds across Alaska will interpret a minor sentence as a license to engage in wrongful conduct. Defendant successfully engaged in a multi-year fraud and lived an extravagant life off the stolen funds. If the sentence is minor, this will not only fail to deter others, but incentivize fraudulent conduct by conveying the dangerous message that such crimes have no meaningful consequences. This Court should not send the message to the "rational, cool, and calculated" white collar offenders that economic crimes have no, or only minimal, criminal liability risk.

This Court should send a clear message that fraud, particularly that causing untold financial damage to vulnerable Alaskans, will not be tolerated.

### 5. Protection of the public from further crimes

A significant custodial sentence is needed to protect the public from future crimes.

Case 3:23-cr-00020-JMK-MMS   Document 52   Filed 11/01/23   Page 23 of 29

As explained above, Defendant engaged in his fraudulent conduct over the span of six years. It was not spontaneous. It was not intermittent. It never subsided and continued to get worse over time – right until the collapse. As Defendant executed the new phases of the fraud, he created more and more new victims. Moreover, many victims have expressed their viewpoints that Defendant will absolutely reoffend upon his release. In one victim impact statement, the victim minced no words about his/her concern regarding Defendant's likely future conduct upon release from custody, stating:

> Your [Defendant's] mind will not be altered at all [during incarceration]. You will not have had time to really go inside yourself or get enough help to alter the way your mind works. You will get out, move out of state or country, and start doing it again. My fear is for others you will steal from in the future.

Sealed Dkt. 45 at 104.

A substantial custodial sentence is required to protect the public from this outcome.

In addition, Defendant's *recent* conduct raises serious concerns about his willingness to avoid questionable money-making schemes and, instead, suggests that he remains eager to find his next get-rich-quick opportunity. As described above, Defendant appears to have squandered approximately $22,000 from December 2022 to March 2023 by developing and testing his trading software idea at two companies. Although these funds do not appear to be criminal proceeds, the play was clear – dump all available resources on a poker-like bet with funds that should have been used to repay investors.[9]

---

[9] Defendant also recently spent $5,000 on sentencing and incarceration consulting services. Sealed Dkt. 46, ¶ 44. While there is nothing inherently wrong with obtaining sentencing advice, the decision to spend $5,000 on, among other things, how to prepare a "lengthy and compelling narrative" for a federal sentencing hearing (https://etikallc.com/shorten-your-

*U.S. v. Elder*

The Court should protect the public from any future fraud by Defendant.

## 6. Avoidance of unwarranted disparities

An 87-month sentence is warranted and consistent with other similar investment fraud cases. According to the PSR, the average and median sentence imposed for similar crimes with a final offense level of 30 (one-level higher than the final offense level, including the §3553 variance equivalent to one-level, set forth in the plea agreement) is 72 months. Sealed Dkt. 46 at ¶ 9. Moreover, for other defendants sentenced to crimes involving investment fraud schemes since 2020, courts regularly impose sentences in the 60-to-120-month range. A sampling of those cases is below:[10]

### 2020
- *U.S. v. Syed Arham Arbab* (19cr51; M.D. GA) – $1 million scheme from 117 vulnerable victims in multiple states and lies in sworn testimony to the SEC: 60-months.
- *U.S. v. Todd Lahr* (19cr496; E.D. PA) – $2.7 million scheme by attorney who also lied in sworn testimony before the SEC: 78-months.
- *U.S. v. Sean Finn et al.* (13cr00439; D. NV) – $6 million scheme where defendant fled to Canada and was convicted after trial: 87-months.

### 2021
- *U.S. v. David Coggins* (21cr20105; M.D. FL) – $1.3 million scheme with a sophisticated means enhancement: 48-months.
- *U.S. v. Daniel Boice* (20cr167; E.D. VA) – $18 million scheme against 254 victims with a sophisticated means enhancement: 97-months.
- *U.S. v. James Leonard Smith et al.* (19cr117 E.D. VA) – Approximately $14 million scheme after trial, including multiple enhancements for promotional money laundering, operating a foreign scheme, and obstruction for lying on the witness stand: 14-years.

---

sentence/) raises doubts about Defendant's financial decisions and whether repaying victims is a top priority.

[10] This sampling is not exhaustive and only provided to highlight a handful of cases since 2000 that involve roughly similar investment fraud schemes with defendants in CHC I.

Case 3:23-cr-00020-JMK-MMS   Document 52   Filed 11/01/23   Page 25 of 29

- *U.S. v. Austin Delano Page* (22cr107; W.D. NC) – $4.2 million loss to more than 200 vulnerable victims across the country and the defendant travelled to Italy as the scheme collapsed: 97-months.
- *U.S. v. Scott Kohn* (19cr239; D. SC) – $310 million scheme against more than 13,000 military and elderly victims across the country: 120-months.

**2023**

- *U.S. v. Patrick Gallagher & Michael Dion* (21cr60103; S.D. FL) – $30 million scheme where defendants stole and hid the funds in in shell companies all over the world: 60-months and 48-months, respectively.
- *U.S. v. Reva Joyce Stachniw and Ron Throgmartin* (21cr148; D. CO) – $15 million scheme with evidence of $280 million in potential losses; sentenced after trial with two different sophisticated means enhancements: 72-months.
- *U.S. v. Dodson* (19cr703; N.D. CA) – $15 million scheme following by a bankruptcy of defendant's investment companies: 60-months.
- *U.S. v. Stollery* (22cr207; C.D. CA) – $21 million scheme involving dozens of investors across 18 states: 51-months.

## 7. Sentencing recommendation

The United States recommends an 87-month custodial sentence, three years of supervised release, restitution in the amount of $26,046,011.61, and forfeiture.

### A.    **Restitution**

Restitution is mandatory in this case. 18 U.S.C. § 3663A(a)(1) provides:

Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate.

18 U.S.C. § 3663A(c)(1) provides:

This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense—
(A)that is—
…
(ii) an offense against property under this title… including any offense committed by fraud or deceit;

18 U.S.C. § 3663A(c)(1). Defendant's conviction under 18 U.S.C. § 1343 is a sentence for an offense again property under Title 18. *Id.*; *United States v. Matsumaru*, 244 F.3d 1092, 1109 (9th Cir. 2001)("The government correctly points out that Matsumaru is subject to the MVRA [Mandatory Victim Restitution Act] because his convictions [including wire fraud] involved fraud under Title 18.").

The parties agree that restitution is mandatory and should be ordered in the amount of $26,046,011.61, as specifically described in the sealed exhibit filed concurrently herewith. *See* Dkt. 30 at 2 and 9-10; Sealed Ex. 2 (Restitution List).

### B. <u>Forfeiture</u>

The Court should order Defendant to forfeit the assets listed in the proposed Preliminary Order of Forfeiture (Dkt. 47), including the requested *in personam* forfeiture money judgment in the amount of $26,046,011.61.

Forfeiture and restitution serve different purposes or goals. Forfeiture is imposed as punishment for a crime; restitution makes the victim whole again. *See*, *e.g.*, *United States v. Davis*, 706 F.3d 1081, 1083 (9th Cir. 2013); *United States v. Carter*, 742 F.3d 440, 447 (9th Cir. 2014)("Thus, in general, restitution and forfeiture are two separate and distinct parts of a criminal sentence, and a defendant does not have a right to have forfeited funds applied to a restitution obligation.").[11]

Here, the Court should order forfeiture of all of the proceeds of Defendant's scheme

---

[11] Forfeited proceeds may, at the discretion of the Department of Justice, be returned to victims through the remission process. *See* 28 CFR Part 9.

*U.S. v. Elder*
3:23-cr-00020-JMK-MMS          Page 27 of 29

as just punishment for his crimes.

First, notice was proper, and Defendant agreed to forfeiture. The Information alleged that all of the proceeds of Defendant's scheme were subject to forfeiture, including substitute property. Dkt. 1 at 5-6. An information notifying a defendant that the government would seek to forfeit all of the proceeds of his crimes, including substitute property, is sufficient notice for the government to seek forfeiture of a forfeiture money judgment. *See United States v. Lo*, 839 F.3d 777, 792 (9th Cir. 2016). In his plea agreement, Defendant also admitted to the forfeiture allegations, including the substitute asset provisions. Dkt. 30 at 10-11. Defendant further admitted that the specific real and personal property listed in the Preliminary Order of Forfeiture was subject to forfeiture. *Id*.

Second, the forfeiture money judgment should be for $26,046,011.61, the agreed-upon restitution amount. Although the government is entitled to forfeit all the proceeds of Defendant's scheme, not just the net profits, *see* 18 U.S.C. § 981(a)(1)(C) & (a)(2)(A), Defendant necessarily agreed that the proceeds of his scheme were at least as much as the restitution amount.

## IV. CONCLUSION

Based on the foregoing, an 87-month custodial sentence followed by three years of supervised release is warranted. Proposed special conditions of supervised release are attached as Exhibit 1. Restitution should also be ordered in the total amount of $26,046,011.61 as set forth in Sealed Exhibit 2.

//

RESPECTFULLY SUBMITTED, November 1, 2023 at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

/s Michael J. Heyman
MICHAEL J. HEYMAN
Assistant United States Attorney
United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2023 a true and correct copy of the foregoing was served electronically on all counsel of record.

/s Michael J. Heyman

Case 3:23-cr-00020-JMK-MMS   Document 52   Filed 11/01/23   Page 29 of 29