Ben W. Muse
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
188 W. Northern Lights Blvd., Suite 700
Anchorage, Alaska 99503
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: benjamie_muse@fd.org

*Counsel for Defendant Garrett Elder*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:23-cr-00020-JMK-MMS |
| Plaintiff, | |
| vs. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| GARRETT ELDER, | |
| Defendant. | |

## I.    INTRODUCTION

It might be said, to quote Ernest Hemingway, that corruption occurs "gradually, then suddenly." Few people think they would ever be the type of person to commit a financial crime, but often enough, it happens through a series of slight compromises, justifications, white lies, omissions, exaggerations, and self-deceptions that accrue over time to something much more substantial—a life compromised.

Garrett Elder did not set out to commit fraud and to be before this Court for sentencing. He did not intend to seriously harm his family, friends, and investors in the way he has. His descent into criminality happened incrementally at first, then accelerated rapidly as he sought to salvage his dreams of being a successful investor.

He is not the motivelessly malignant, one-dimensional caricature he has been made out to be by some. He is at once the self-sacrificing person who pulled a woman from a burning car,[1] the loving father of two young children, and a man who deceived his family and close friends causing them indescribable suffering.

Mr. Elder could be a case study in the Dunning-Kruger effect.[2] He had no real training, experience, or accreditation, yet he sincerely believed he could safely, and profitably invest his client's money in the highly volatile foreign currency marketplace.[3] To give one illustrative example of the sheer incompetence of his actions: he paid $4

---

[1] Exh. D-5.

[2] "In psychology, a cognitive bias whereby people with limited knowledge or competence in a given intellectual or social domain greatly overestimate their own knowledge or competence in that domain relative to objective criteria or to the performance of their peers or of people in general." Britannica, *Dunning-Krueger Effect*, available at https://www.britannica.com/science/Dunning-Kruger-effect (last visited November 2, 2023); *see* Joyce Ehrlinger et al., *Why the Unskilled Are Unaware: Further Explorations of (Absent) Self-Insight Among the Incompetent*, 105 Organizational Behav. & Hum. Decision Processes 98, 99 (2008)("People are typically overly optimistic when evaluating the quality of their performance on social and intellectual tasks. In particular, poor performers grossly overestimate their performances because their incompetence deprives them of the skills needed to recognize their deficit"); Justin Kruger & David Dunning, *Unskilled and Unaware of It: How Difficulties in Recognizing One's Own Incompetence Lead to Inflated Self-Assessments*, 77 J. Per & Soc. Psychol. 1121, 1127 (1999)("People tend to hold overly favorable views of their abilities in many social and intellectual domains. The authors suggest that this overestimation occurs, in part, because people who are unskilled in these domains suffer a dual burden: Not only do these people reach erroneous conclusions and make unfortunate choices, but their incompetence robs them of the metacognitive ability to realize it.").

[3] The Commodity Futures Trading Commission notes: "Off-exchange foreign currency trading, also called forex, is very risky. Beyond the general volatility between currency prices that any trader could face, fraud is prevalent in the market." Commodity Futures Trading Commisssion, Foreign Currency Trading, available at https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/ForeignCurrencyTrading/index.htm (last visited November 2, 2023).

million in off-the-top commissions just to trade $16 million for his clients. But Mr. Elder sincerely believed he was competent to be doing what he was doing, and he was good at attracting investors because he believed in what he was selling.

All his actions, however duplicitous, were guided by the over-arching belief that he would ultimately be right and earn himself and everyone else a lot of money. So he lied to people by exaggerating and fabricating his investing prowess, to get an opportunity to invest their money. He fabricated account statements so that investors would not realize how much money had been lost and would keep their money invested. He misappropriated his clients' money, despite the fact he was incurring massive trading losses. And he justified his actions because he foolishly believed they would ultimately be harmless, that it would never be an issue; that he could just invest his way out of any hole he got himself into.

Instead, in the end, he lost nearly $25 million and decimated the finances of his friends, family, and outside investors.

Approximately, 80% of investor funds were traded (and lost). Elder made some money trading. But he lost much more. When he suffered devastating losses, instead of coming clean, he doubled down and sought out more capital. He just needed a good run, a few more trades, and everything would be all right.

The remaining 20% of investor funds were misappropriated. He spent between $3-4 million on payroll, on extravagant gifts to friends and family, on lavish vacations, on real

estate, and on a truck, boat, and camper. This was *inexcusable*. Especially against the backdrop of the huge trading losses that were accruing.

Since Tycoon Trading and Daily Bread Fund began to fall apart in September 2022, Elder has worked hard to try to do the next right thing. He took responsibility immediately for his actions. He met with the FBI and DOJ in early October 2022, on the eve of the birth of his second child, and came clean. Since then, he has met often with the FBI and DOJ, without any kind of proffer agreement, and has attempted to provide them with all information regarding his actions. He has turned over records to assist the investigation, and he has worked with the FBI and DOJ to identify his remaining property that could be liquidated to compensate investors. He no longer works in finance and instead works multiple jobs to support his wife and two young children.

Elder feels deep remorse for his actions and is committed to spending the rest of his life repaying his victims. He realizes that any apology, given his grave deception, is likely to be inadequate, and will fall on deaf ears or be misconstrued as manipulation. He hopes that his daily actions since his offense will serve to show his sincerity.

He also understands that he needs to be held accountable for his crime, and for all the people he hurt. He respectfully requests that the Court vary downward from the Guidelines and impose a sentence of 60 months with supervised release to follow, on the terms outlined by the government. No sentence will make his investors whole, but a sentence of 60 months strikes the balance of holding Elder accountable while allowing him

to be released when he is still young and able to work to make money to provide restitution to his victims.

He also requests that the Court recommend he be placed at FCI Englewood, as his mother owns a condominium near that institution.

## II.    FACTUAL BACKGROUND

### A.  Early Life

Garrett Elder moved to Alaska in 1999 with his family when his father, Chris Elder's, Colorado fish farming business failed.[4]

Garrett[5] grew up in a loving home. He was very active in his religious community in Big Lake, attending church twice a week, cleaning the church with his family, and doing mission work.[6] Garrett excelled at schoolwork and athletics and graduated class valedictorian, with a full scholarship to attend UAA.[7]

His parents instilled in him a work ethic. Shortly after their move to Alaska his father, Chris, became a real estate agent and began to invest in real estate, and flip properties. Growing up, Garrett would help him with the renovations.[8] Throughout his youth and young adulthood, he has worked consistently,  mowing lawns, delivering pizzas,

---

[4]      Exh. D-1.
[5]      For sake of clarity, the factual background section will use first names to distinguish between the two Elders.
[6]      Exh. D-1.
[7]      Exh. D-1.
[8]      Exh. D-1.

bookkeeping, and commercial fishing.[9] When he was a full-time student at UAA he held down 2-4 jobs at any one time.[10]

His father, Chris has had an outsized influence on Garrett. He was successful and well-respected in the Mat-Su business community and was also a leader in his church. Garrett idolized his father.[11]

## B. Employment Through Father

Garrett's parents separated while Garrett was attending UAA, and this separation would ultimately lead to his parent's divorce. During the separation, Chris began to suffer from alcohol misuse and got two DUIs between 2012 and 2015. While Garrett had been assisting his father part-time for years, in 2014, the year he graduated from UAA, he took on more responsibility with his father's business interests to ensure these businesses would not collapse. At this point, in addition to renovating houses, his father was also running a local water utility.[12] Due to problem drinking, his father would not show up to work all the time or would show up hungover and useless.[13] Garrett would have to step in.

In 2014, Chris Elder incorporated Lake Haven, LLC. This LLC was to be used to raise funds to develop a piece of property Chris had purchased in Big Lake into a trailer

---

[9]     Exh. D-1.
[10]    Exh. D-1.
[11]    Exh. D-1.
[12]    Exh. D-1.
[13]    Exh. D-1.

park. Chris wanted to construct approximately 20 trailers, at approximately $50,000 per trailer and initially hoped to secure $1 million in loans for this business venture.

Garrett's childhood friend, Jerry Fetta, was an investment advisor, who had clients looking to invest in real estate. Fetta directed his clients to Chris Elder to invest in Lake Haven. Chris issued promissory notes to these investors where he would agree to a high interest rate—8-12%—and a balloon payment of the principal after a period of years; these notes were ostensibly secured by the trailer park.[14] The money obtained through promissory notes far exceeded the amount Chris needed for his business venture and far exceeded the value of the underlying collateral, the property being developed. While some money was spent to develop the trailer park, the majority of the money received from investors was not. Instead, Chris used the money as a slush fund for personal expenses, to invest in other businesses, and for payroll.

Subsequently, to service his debt on the promissory notes for the trailer park, Chris secured additional, high-interest loans, via promissory notes, from investors referred by Jerry Fetta, as well as other investment advisors.[15] These promissory notes were not registered by the SEC or Alaska securities regulators.[16] He used part of the money from

---

[14]     Exh. D-1.
[15]     The issues with these promissory notes are well documented in Chris' Palmer probate case, 3PA-23-00175CR, where numerous investors outline their promissory note debt, which they believed was secured by real property, in trying to collect from Chris's estate. It appears 63 such claims have been filed. Exhibit D-3. contains a representative sample.
[16]     Exh. D-2.

these loans to pay off the promissory notes for the trailer park and directed the unused money to himself.

In turn, Chris needed money to make payments on the promissory notes to pay off the promissory notes to finance the trailer park. Again, Chris would find more investors interested in lending their money at a high-interest rate.

And so it went. Chris built a house of cards and debt.[17]

Chris would use the money from the promissory notes, that was unnecessary to servicing his monthly debt obligation, for a host of other business ventures and personal expenses. Over time, Chris's monthly debt obligation grew throughout this activity from an estimated $5000 to $150,000.

Garrett, as his father's employee, realized what his father was doing was problematic and unsustainable, but he struggled to accept that his father, the man he looked up to more than anyone would engage in fraudulent behavior. His father was a community leader and pillar of their church.[18] His father seemed to take the attitude that, if everyone was getting paid, there was no issue, ignoring the unsustainable structure of the

---

[17]       The SEC provides the following indicia of promissory note fraud, most of which are seemingly met by Chris's use of promissory notes: (1) promissory notes are unregistered with federal or state regulators; (2) seller is not licensed to sell securities; (3) the interest rate offered is far higher than the market rate for other similar investments such as long term Treasury bonds, or FDIC insured certificates of deposit; (4) seller offers risk-free or guaranteed returns. United States Securities and Exchange Commission, *Promissory Notes*, available at https://www.investor.gov/protect-your-investments/fraud/types-fraud/promissory-notes (last visited November 2, 2023).
[18]       Exh. D-1 a 5.

arrangement. Part of him began to wonder if his father's methods were just how business was conducted in the real world, in a legal grey area.[19]

Garrett was employed by his father from 2014-2020 and made approximately $55,000 a year. Ultimately, Garrett stopped working for his father in 2020. In part to pursue his own financial operation through Tycoon Trading and Daily Bread Company. But in part because he was increasingly uncomfortable with his father's business methods. The irony was he was adopting the very practices he disapproved of, but would deceive himself into believing he was different.

### C. Lack of Success Investing.

Garrett had dreams of becoming a successful investor, but little experience or mentorship. He notes that when he founded Tycoon Trading with his brother Blake, he was

> Full of rosy dreams of success, but quickly learned that few novices make money trading. However, I built up so much confidence over the years as an academic success that I refused to be deterred. I felt it was just a matter of time before I finally caught on and could earn outsized returns.[20]

He grew dissatisfied with his classes at UAA because they did not teach stock trading and set out to learn investment strategies through Maverick Trading, an online proprietary trading firm.[21]

---

[19]     Exh. D-1 at 5 ("My incredibly wonderful takeaway lesson from working with my father was that I would have to "fake it until I make it" to get ahead in business.").
[20]     Exh. D-1.
[21]     Exh. D-1 at 4.

In 2012, he formed Tycoon Trading. He started off investing $10,000[22] that his parents gave him. He lost this money investing.[23]

Undeterred by his losses, he soon was investing the money of friends, family, and acquaintances. He told them he was a successful investor and convinced himself that this was going to be the case. Between 2016 and 2018 he received over $500,000 in investor funds. He lost money rapidly. He hoped he could correct course, and to prevent investors from withdrawing their capital, he sent investors false account statements suggesting that he was successful. He never was. He ultimately lost all his investors' money trading. He disclosed the loss to his investors but did not disclose his deception. Some were mad, some forgave him for his mistake. He vowed to make amends and to repay the investors who lost money.

So he solicited new investments through Tycoon Trading and another LLC he incorporated out of Wyoming—the Daily Bread Fund—by representing to prospective investors, or allowing others to represent to investors, that he was an experienced, self-taught trader, with an established track record of success.

Garrett ran his investment companies out of an office in Anchorage. He shared his office space with several other traders, whom he was ostensibly mentoring. His wife

---

[22]     The government's sentencing memorandum states that this was $20,000. Dkt. 52 at 5. It is believed that this was a $10,000 gift to encourage Garret's interest in investment. Garrett's brother, then a partner in Tycoon Trading, received the same amount.
[23]     Exh. D-1. at 4.

worked as the office administrator. Garrett would diligently go to the office each day from 2 a.m. to 8 a.m. to trade and appeared to be in control. He deceived everyone in the office. His wife had no idea fraud was occurring as she sent out the fraudulent account statements drafted by Garrett. The traders were also deceived by Garrett. Garrett led them to believe they were actually trading in the foreign currency market when the reality was he was trading (and losing) their money for them and they were using demo accounts. Driving his actions again, was his conviction that he knew best, and that ultimately everyone would benefit.

While on paper, Tycoon Trading was operational from 2012, the majority of account activity occurred between January 2020 and December 2022, when Garrett solicited nearly $24 million in investor funds for Tycoon Trading and the Daily Bread fund. Approximately $5.5 million of these funds were from his father, Chris.

Chris invested, beginning in 2017 ($50,000), but increased his investment considerably in 2021 ($1.4 million) and 2022 ($4.1 million), because he believed Garrett's lies about being a successful investor. Chris was facing massive amounts of debt and hoped that he could work his way out of debt through his son. Garrett, in turn, knew his father was struggling financially, and did not want to disappoint him.[24] Though Garrett was already in a massive hole, he decided to pursue an even more aggressive investment

---

[24] Exh. D-1.

strategy. When his father was diagnosed with an extremely rare form of cancer in 2021, this only increased the urgency.

With Tycoon Trading and Daily Bread Fund, profit was the exception rather than the rule. The following graph displays the wild swings, the massive profits that Garrett made through trading, and the even more significant losses:





Due to his significant losses, Garrett was heavily dependent on new investors to stay viable. He hoped to be able to invest his way out of his financial problems with new capital. Garrett recruited some investors, and other investors were recruited for him. Jerry Fetta was instrumental in securing Garrett's new investors. Fetta would assist people in converting their standard 401(k) into a self-directed 401(k) so that they would be able to invest it with Garrett. Fetta would receive a commission by directing clients to the Daily Bread Fund. Fetta's assistance, combined with Mr. Elder's efforts kept Elder supplied with new funds that he could invest.

Garrett's trading venture was structured in a way that made it very difficult to turn a profit. Garrett typically paid a 20% commission off the top, just to invest, and in the end, paid $4.3 million in commissions to have the ability to invest $16.3 million of investor money. Just to put investors at status quo ex ante he would have to earn a 25% return on his investment. The following chart breaks down how the money Garrett moved to brokerage trading was allocated:

//

//

//

//

//

//



**Allocation of Money moved to Brokerage Trading**

Funds Invested in Trading        21,734,393.93

| Funds Lost in Trading | 16,358,136.17 | 75% |
|---|---|---|
| Commission & Fees | 4,317,434.40 | 20% |
| Paid to other Traders | 855,051.02 | 4% |
| Trader Training Costs | 145,509.54 | 1% |
| Licenses & Softwares | 58,262.80 | 0% |

This 20% off-the-top "administration fee" was actually disclosed to investors, who were still eager to invest—given how Garrett's financial acumen in the foreign currency market had been represented to them:

//

//

//

//

## USE OF PROCEEDS

**Estimated Use of Proceeds**

Inasmuch as it is impossible to predict exact costs and the expenses necessary to trade in the foreign currency market and manage the Fund's affairs, actual expenditures could vary substantially and materially from the following estimated use of proceeds (rounded):

| | Maximum Offering (3)(5) | |
|---|---|---|
| *Sources of Proceeds* | **Dollar Amount** | **Percentage** |
| Capital Contributions of Investing Members (1)(2) | $30,000,000 | 100.00% |
| *Use of Proceeds* | | |
| Investment in Currencies (4) | $24,000,000 | 80% |
| Operational and administrative costs (4) | $6,000,000 | 20% |
| *Total Proceeds* (4) | $30,000,000 | 100.00% |

FOOTNOTES:

In total, Garrett took in approximately $26 million in investor funds. Some of this money was disbursed back to investors. About $21 million was traded. The remaining money—amounting to several million dollars, was misappropriated by Garrett, either to pay payroll, to allocate to other investment opportunities, to spend on himself, or to give away. Garrett purchased a truck, a boat, and a travel trailer. He spent $700,000 on a swath of land in the Glen Alps. He gave investor money to friends in need. He sponsored his brother's snow machine racing team. And he took many vacations, including one where he

flew all the traders working at the Tycoon Trading office to Hawaii via private jet from Anchorage and paid for their expenses for several weeks.

The misappropriation of assets here is inexcusable.

But it also should be emphasized that **80%** of investor funds were lost through active attempts at trading; that is, through active attempts to earn money for his investors.

### D. Mizuna Entities

In 2021, Garrett, along with Jordan Trice, incorporated Mizuna Matata LLC and Mizuna Capital LLC. They had an agreement where Trice would manage the investment entities and attract investors and Garrett would trade utilizing Mizuna's investor funds. In entering into the partnership, Garrett misrepresented his trading track record to Trice, and Trice represented to investors that Garrett was an experienced and skilled trader with a documented record of positive returns.

Garrett did not misappropriate funds from these investors. Nor did he fabricate investment returns. In the aggregate, he lost investor funds through trading, though Trice notes that for the first few months, Garrett did "very well." He compensated the Mizuna investors for some of their losses with money from Tycoon Trading and the Daily Bread Fund. It does not appear Garrett was compensated in any way for his work for Mizuna Matata. As Trice put it, in an interview with the FBI, though Elder was entitled to a management fee, he never asked for it and Trice never paid it. Garrett notified Trice of his

fraud in October 2022. Subsequently, Trice sought to keep Garrett on as an investment advisor. Garrett declined.

### E. Investigation

In August 2022, a CPA associated with one of Garrett's investors noticed irregularities in Garrett's operation. The CPA discovered that Garrett was completely unfamiliar with IRS reporting or federal tax protocols and reported him to the State Division of Banking and Securities ("Division").[25] On September 28, Garrett received a letter from the Division informing him he was under investigation. The guilt he felt from his dishonesty, and from failing all the people who trusted him, became too much. Garrett began to confess to friends and family regarding what he had done. He also halted his trading operations.

Shortly thereafter, those he confessed to, appropriately, reported him to the FBI. On, approximately, October 2, Garrett was contacted by the FBI regarding the reports they had received, and on October 10, 2022, he sat down with counsel, and with representatives of the FBI and the government and began the painful process of coming clean.

It should be noted, that at the time—October 2022—Garrett's wife was due with his second child at any moment. It would have been easy to delay or make excuses, or, like many caught in their lies, he could have denied wrongdoing or tried to shift blame onto others.

---

[25] Dkt. 45 at 13.

But Garrett decided to cooperate with the investigation at the earliest possible juncture.

He met with FBI agents without a proffer agreement immunizing him from his statements. For Garrett, coming clean at that moment was the right thing to do regardless of the consequences, and he does not regret the decision to do so.

In the weeks that followed he would continue to meet with the FBI to outline the scope of his activities and answer questions. He provided them with his records and computers. He also outlined his assets—personal property of value, real estate, and outstanding funds in bank accounts—so that they could be frozen or otherwise seized by the government.[26] He (or his attorney) personally delivered his boat, truck, and camper—his most valuable possessions besides his condo—over to the government for forfeiture. Recently, he has overseen the sale of his condo so that the equity could be put in a restitution fund for investors.

### F. Post-October 2, 2022.

With the failure of Tycoon Trading and the concurrent loss of $5 million, Chris lost his ability to service the debt load on the numerous promissory notes he had taken out. Shortly after Garrett's criminal conduct was uncovered, on October 28, 2022, Chris, sent out a letter to his investors claiming that Garrett had defrauded him of all their money.[27]

---

[27]     Exh. D-4.

Many of these investors raised legitimate concerns about why their loan, which was purported to be used to purchase real estate and which was secured by real property, was being used to invest in Tycoon Trading.[28] This was, apparently, not what was represented to them when they agreed to enter into the promissory notes.[29]

Garrett did not mislead, or defraud Chris's investors, but this letter had the effect of misdirecting additional anger at Garrett from some of those who had invested money with Chris and has caused the public to perceive that Garrett was involved in Chris's business ventures and his debts.

Shortly after he sent this letter to his lenders, Chris's condition suddenly worsened, and he succumbed to cancer on January 4, 2023. Despite their complex relationship, Chris and Garrett made amends, and his death was a devastating blow.

In the past year, Garrett has kept his head down and tried to provide for his family. Given the understandable acrimony towards him, he found it difficult to obtain a job but ultimately found one as an operator for a snow removal company. He started at $20 an hour

---

[28]    Exh. D-1.

[29]    Dkt. 54-1 at 5 (from December 16, 2022, interview with a victim: T.B. was introduced to Chris Elder via Z.B. T.B. invested in real estate development ventures with Chris Elder three times in 2018. M.B. transferred a $15,000 Roth IRA and $80,000 in non-retirement funds. T.B. transferred a $82,000 401K. The investments were 10-year Promissory Notes that paid 12%. T.B. has tried to contact Chris Elder via email and through Z.B. but Chris Elder has not responded. Chris Elder sent a letter to his investors including the Bs which stated he invested some of their money with Garrett Elder and Garrett Elder had committed fraud and that money was lost. T.B. thought that his money was to be invested in real estate and this letter was the first time he had heard about Chris Elder investing with Garrett Elder.).

on November 9, 2022, and shortly began to take on more responsibility and received a pay raise to $24 per hour.[30] He would work 12-16 hour night shifts and then come home to care for his newborn and energetic two-year-old.

He has endeavored to work to set his family up to be self-sufficient when he goes into custody. Working nights allowed him to assume a greater share of the childcare responsibilities so his wife could find work and grow her business during the day (website design and marketing). When his snow removal job ended for the season, he began driving for DoorDash so that he could have a more flexible schedule. He plans on continuing the operator job when the snow flies and until he reports to serve his sentence.

In early 2023, he was still trying to think of ways to make his investors whole. Believing his only real employable skill to be in finance, he tried to conceive of ways in which he could make money from his experience without actually participating in the marketplace. He had saved some money from work, and had some money which he aggregated from liquidating small personal assets—bikes, tools, etc.—and he decided to pay an Estonian company to develop an algorithm based on his investment ideas. He hoped that this algorithm, which would complete automated trades, could be used to make money on the foreign currency exchange, and would result in a meaningful source of restitution to his victims while he was in custody. Unsurprisingly, the algorithm based on his investment ideas was tested and found to be ineffective. This foolish venture has reaffirmed to him

---

[30]     Exh. D-1.

that he needs to stay out of finance.

Garrett has instead worked to establish himself professionally in a new field. On September 29th, he passed his permit test and earned his CLP, Commercial Learners Permit for a Class A license.[31] He is currently studying for several professional credentials— doubles/triples, hazmat, and tanker endorsements as well as an Entry Level Driver Training Certificate (a requirement to obtaining a CDL license)—so that when he is released from custody he has a trade he can go into, unrelated to finance, in which he can earn money to compensate his victims.

### III.   GUIDELINES

Mr. Elder agrees with the guideline calculation in PSR: Offense Level 30, Criminal History Category I, 97-121 months.[32] The government has agreed to request a one-level downward variance based on numerous factors, including, the assistance Mr. Elder provided in the investigation and in securing his assets.[33] Accordingly, with a one-level downward variance, Mr. Elder's Guideline range is 87-108 months.

### IV.   AN ANALYSIS OF 18 U.S.C. § 3553(a) SUPPORTS A DOWNWARD VARIANCE.

The Court's task here is to identify and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.[34] Although the Guidelines are

---

[31]    Exh. D-1.
[32]    Dkt. 46 at ¶¶ 13-22.
[33]    Dkt. 30 at 13.
[34]    18 U.S.C. § 3553(a).

the starting point for the calculation of an appropriate sentence, a district court "may not presume that the Guidelines range is reasonable."[35]   Instead, the Court "must make an individualized assessment based on the facts" of each case, recognizing that a within-Guidelines sentence may be greater than necessary to serve the purposes of sentencing.[36] If the Guidelines calculation in a given case results in an "inordinate emphasis" on "putatively measurable quantities," like financial loss, a court should focus more on the statutory factors outlined in 18 U.S.C. § 3553(a) to determine an appropriate sentence.[37] Indeed, the Court "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."[38]

The Court must assess what sentence is reasonable based on all the factors, including: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the purposes of sentencing, including the need for deterrence and to protect the public; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) any relevant policy statements issued by the Sentencing Commission; (6) the need to avoid

---

[35]     *Gall v. United States*, 552 U.S. 38, 50 (2007).
[36]     *Id.*; *Kimbrough v. United States*, 552 U.S. 85, 91 (2007); *see United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) ("Imposing a sentence on a fellow human being is a formidable responsibility.  It requires a court to consider, with great care and sensitivity, a large complex of facts and factors.").
[37]     *United States v. Adelson*, 441 F. Supp. 2d 506, 509-12 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x. 93 (2d Cir. 2008).
[38]     *Kimbrough*, 552 U.S. at 101.

unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense.[39]

An analysis of the relevant § 3553(a) factors supports a sentence of 60 months.

**A. The Nature and Circumstances of the Offense Supports a Downward Variance.**

The damage done to investors by the loss of their savings is substantial, life-altering, and impossible to remedy. In no way does Mr. Elder seek to minimize the harm he has caused to the people who trusted him. Certainly, the loss amount and the serious harm caused to many of his investors are factors that weigh in favor of a significant period of incarceration.

Yet, it is important to note several circumstances present here that make it less serious than other similar offenses.

First, Mr. Elder's intent and conduct are highly relevant here. Mr. Elder did not set out to defraud people and tried to legitimately invest the vast majority ($21 million) of funds he received. He intended to enrich his investors and to make a name for himself. He perpetuated the offense for as long as he did because he hoped he could recoup the investor money he lost if he continued to invest. While the whole endeavor was highly flawed, and misguided, it's important to distinguish Mr. Elder's conduct from that of a fraudster who acts purely to steal and enrich themselves.

---

[39]     18 U.S.C. § 3553(a).

Second, Mr. Elder quickly acknowledged his crimes to investigators, assisted in the investigation, and facilitated the recovery of assets. He stopped trading when he opened the letter from the Division of Banking and Securities. That letter was a wake-up call. Before reading that letter, he had been deluding himself into believing that he could dig out, and make his investors whole. This letter shocked him and made him realize that he could not continue. His activities came to a quick end, and his actions prevented investors from suffering additional losses.

### B. The History and Characteristics of Mr. Elder Support a Sentence of 60 Months.

During this offense, Mr. Elder was young, proud, and not self-aware enough to understand he lacked the requisite skill and experience to be trading something as volatile as foreign currency. Mr. Elder's relative youth[40] and lack of criminal history support the imposition of a 60-month sentence.

Further, Mr. Elder does not have any substance misuse issues or mental health issues. He has a college degree and has had a consistent work history since he was a child. He has even worked multiple jobs during the last 12 months to support his family.

Mr. Elder also has strong family support. His wife has stuck with him through this incident and he has two children who adore him. His mother, sister, and brother, all live locally and are prepared to support him when he is released from custody.

---

[40]     *See, e.g.*, *Gall v. United States*, 522 U.S. 38, 58 (2007)("Immaturity at the time of the offense conduct is not an inconsequential consideration.").

Finally, though Chris Elder loomed large in his son's life, he did not commit the fraud perpetrated by Garrett. That being said, Chris's fraudulent activity normalized this sort of conduct to Garrett, had a psychological impact, and likely influenced Garrett's conduct.

## C.  A Sentence of 60 Months Effectively Achieves the Goals of Specific and General Deterrence.

There is a great deal of empirical research illustrating the counter-intuitive proposition that lengthier sentences of incarceration are, generally, an ineffective deterrent.[41] Potential criminals are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentencing consequences in the way an ideal rational decisionmaker hypothetically would.[42] Even the Sentencing Commission recognizes the fact that the graduated sentences it prescribes do not correlate to reduced recidivism:

> There is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high Guideline offense level, recidivism rates are similar.

---

[41]      *See, e.g.*, Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006); Charles Loeffler et al., *The Impact of Incarceration on Recidivism*, 5 Annual Review of Criminology 133 (2022), available at https://www.annualreviews.org/doi/full/10.1146/annurev-criminol-030920-112506 (last visited April 26, 2023)("Most studies we review, in fact, find that the experience of postconviction imprisonment has little impact on the probability of recidivism.").

[42]      *See Id.*; Andrew J. Oswald, *Irrational Actors*, 348 SCI. 1099, 1099 (2015) (discussing the belief that one of the major failings in economics is the misplaced idea that people are rational actors); Gary Kleck, et al., The Missing Link in General Deterrence Theory, 43 Criminology 623 (2005)("There is generally no significant association between perceptions of punishment levels and actual levels…implying that increases in punishment levels do not routinely reduce crime through deterrence mechanisms.").

While surprising at first glance, this finding should be expected. The Guidelines' offense level is not intended or designed to predict recidivism.[43]

A wealth of studies suggest that particularly in the case of white-collar offenders it is the certainty of punishment, *i.e.*, the certainty of being caught, that deters more than the extent of punishment once caught.[44]  That is, the length of the sentence imposed, will not necessarily have any appreciable impact on general deterrence. While some might contend that white-collar defendants are sophisticated actors who engage in a careful cost-benefit analysis, this instant case clearly shows that white-collar defendants are as susceptible to irrational behavior as criminal defendants. There is nothing rational about the actions taken by Mr. Elder. This was, obviously, not a sustainable scheme. He spent $4 million to trade $16 million. Much like many other criminal defendants, he deluded himself and

---

[43]     *See* U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004).

[44]     *See, e.g.*, Mihailis E. Diamantis, *White-Collar Showdown*, 103 Iowa L. Rev. Online 320, 327 (2017)("doubling the chance of capture has a greater deterrent effect than doubling the sanction. This is just a seemingly irrational quirk of white-collar psychology, and one that should affect how we think about deterring white-collar crime.);  *see also* Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27, 49 n.96 (2015) ("[A] short prison stay ... may not provide more than a marginal impact [for white-collar criminals] beyond the experience of prosecution, conviction, and sentencing." (quoting David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587, 599 (1995)); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just.: A Review of Research 28-29 (2006); Gary Kleck et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005); Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995).

impulsively engaged in short-term gratification without any real consideration of the long-term consequences of his actions.

Further, while some believe that incarceration is necessary to achieve the goal of deterrence, other aspects of conviction have a significant deterrent effect.

Mr. Elder's case has received a great deal of publicity, with reporters even showing up unannounced at his residence or cornering him on the street. While this is a natural consequence of his conduct, it can be safely said it creates a significant disincentive to reoffending, to avoid further embarrassment and harassment.

Further, Mr. Elder's conviction also brings with it so-called "civil death," the operation of the "[m]yriad laws, rules, and regulations" that prevent the reintegration of offenders into society, even after they have served their sentence.[45] This will serve as a constant reminder when he emerges from prison of how the poor decisions he made fundamentally altered the course of his life. He will have to scratch and claw to get any kind of normalcy back, and it's unlikely he would choose to re-offend and in turn, make his reintegration and family's life harder.

---

[45] *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (internal quotation marks omitted).

Also, though often imposed as an afterthought, supervised release is a serious sanction, constituting a significant restriction on Mr. Elder's liberties, and its imposition will deter Elder from reoffending.[46]

Finally, since Mr. Elder began to solicit investments in earnest for Tycoon Trading and Daily Bread Fund, he has had two children. He will now, appropriately, be absent for a significant portion of their childhood. He would do anything to have this time, and the thought of going back to jail and being removed from his children's lives again is a significant deterrent from ever reoffending.

### D. The Need to Avoid Unwarranted Disparities Between Defendants Warrants a Downward Variance from the Guidelines.

In *Kimbrough*, the Supreme Court held that a district court is free to sentence below the Guideline range where the particular Guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role" of "tak[ing] account of 'empirical data and national experience'" and results in a sentence that is "'greater than necessary' to achieve § 3553(a)'s purposes[.]"[47]

In this case, the base offense level is 7, while the loss amount enhancement is +20.[48] This is the type of case where the impact of the loss enhancement means that the Guidelines

---

[46]     *Gall v. United States*, 552 U.S. 38, 48 (2007)(recognizing "that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.").

[47]     *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).

[48]     §§2B1.1(a)(2), (b)(1)(k)

fail to "provide reasonable guidance," and are of limited "help to any judge in fashioning a sentence that is fair, just, and reasonable."[49]

Unlike many other guidelines, the loss table was not grounded in empirical data concerning prior sentences.[50] As one commentator has noted

> For the small class of defendants... convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges.[51]

Beginning just two years after the Guidelines went into effect in 1987, the loss enhancement, and correspondingly, prison sentences for fraud offenders were steadily increased. In 1987, if the loss was more than $5,000,000 ($13,000,000 in 2023 dollars[52]) the upward adjustment was 13 levels;[53] today it's 20.[54] There is no empirical support for such a drastic modification of the loss amount enhancement and corresponding higher sentencing ranges. Longer sentences have not been shown to deter white-collar criminals. Rather the empirical research regarding white-collar offenders shows no difference

---

[49]    *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir.2008); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentences turn on this single factor, the Sentencing Commission ignored [§ 3553(a)] and . . . effectively guaranteed that many such sentences would be irrational on their face.").

[50]    *See United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring).

[51]    Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent'g Rep. 167, 168 (2008).

[52]    United States Bureau of Labor Statistics, CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm (last visited October 28, 2023).

[53]    § 2B1.1(b)(1)(1987), available at https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_2_A-C.pdf (last visited OCtober 28, 2023).

[54]    U.S.S.G.§2B1.1(B)(1)(L).

between the deterrent effect of probation and that of imprisonment.[55] While the amount of "loss" is the primary determinant of the offense level for fraud offenders, loss is a highly imperfect measure of the seriousness of the offense.[56] In a high-loss case, the recommended advisory Guideline sentence is typically an extraordinarily long sentence for a first-time offender, a sentence that is more appropriately reserved for violent and/or repeat offenders who need to be isolated from the community.

The Second Circuit responded to these criticisms in 2016 and held that the idiosyncratic nature of the loss amount enhancement was alone sufficient to justify consideration of a non-Guidelines sentence:

> [T]he Commission valued fraud (and theft and embezzlement) at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range. This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider. Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.[57]

---

[55]    David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587-607 (1995); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007)( "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

[56]    *See United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn on this single factor [loss or gain], the Sentencing Commission ignored [3553(a)] and . . . effectively guaranteed that many such sentences would be irrational on their face."), aff'd, 747 F.3d 111 (2d Cir. 2014).

[57]    *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (emphasis added) (citations omitted) (remanding to "permit the sentencing judge to consider whether the significant effect of

Across the country, judges seem to agree: the Sentencing Commission's data shows that there is an "increasing divergence between the average Guidelines minimum and the average sentence actually imposed as loss amount grows."[58] In FY 2022, courts across the country varied downward from the Guidelines in 41.8% of cases for defendants sentenced under USSG § 2B1.1.[59] The average loss amount in those cases is $6.3 million.[60] The average downward variance was 58% of the low end of the guidelines.[61] The average fraud sentence was 22 months, and 19 months for Criminal History Category I defendants like

the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence").

[58] Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 22 (2013); *see* Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 Yale L. J. 1018, 1025 (2016)(concluding that review of the post-*Booker* sentencing data "empirically corroborate[d] scholarly criticism that the loss table often vastly overstates the seriousness of an offense").

[59] United States Sentencing Commission, 2022 Annual Report and Sourcebook of Statistics at 159 (2023), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2022/2022-Annual-Report-and-Sourcebook.pdf (last visited October 30, 2023).

[60] United States Sentencing Commission, 2022 Annual Report and Sourcebook of Statistics at 158 (2023), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2022/2022-Annual-Report-and-Sourcebook.pdf (last visited October 30, 2023).

[61] United States Sentencing Commission, 2022 Annual Report and Sourcebook of Statistics at 101 (2023), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2022/2022-Annual-Report-and-Sourcebook.pdf (last visited October 30, 2023).

Mr. Elder.[62] This has remained fairly stable over time[63]:



**Figure E-4**
**SENTENCE LENGTH OF ECONOMIC OFFENSE OFFENDERS OVER TIME[1]**
**Fiscal Years 2013 - 2022**

[1] Only offenders sentenced under §§2B1.1 (Theft, Property Destruction, and Fraud Offenses), 2B3.1 (Robbery), 2B4.1 (Bribery), 2B5.1 (Counterfeiting), or 2B5.3 (Copyright) are depicted in this figure. Sentences of 470 months or greater (including life) and probation are included in the sentence average computations as 470 months and zero months, respectively. The information in this figure includes conditions of confinement as described in USSG §5C1.1. Cases missing sentencing information were also excluded. Descriptions of variables used in this figure are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2013 - 2022 Datafiles, USSCFY13 - USSCFY22.

With regard to investment fraud in particular, in FY 2022, the average Guideline minimum was 88 months, while the average sentence was 47 months.[64] A third of investment fraud cases, involved loss amounts over $9.5 million.[65] Half of defendants

[62]     United States Sentencing Commission, 2022 Annual Report and Sourcebook of Statistics at 81 (2023), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2022/2022-Annual-Report-and-Sourcebook.pdf (last visited October 30, 2023).

[63]     United States Sentencing Commission, 2022 Annual Report and Sourcebook of Statistics at 162 (2023), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2022/2022-Annual-Report-and-Sourcebook.pdf (last visited October 30, 2023).

[64]     United States Sentencing Commission, Quick Facts Securities and Investment Fraud Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Securities_Fraud_FY22.pdf (last visited October 30, 2023).

[65]     United States Sentencing Commission, Quick Facts Securities and Investment Fraud Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-

received a downward variance from the bottom of the guidelines and this sentence reduction averaged 48.7%.[66] The following graph displays how the average investment fraud Guideline calculation has risen in recent years while the average sentence has remained fairly flat[67]:



Specifically, for those equivalent to Mr. Elder on the sentencing table, the United States Sentencing Commission's Judiciary Sentencing INformation (JSIN) data provides the following information regarding defendants with an Offense Level of 29 and a Criminal History Category of I being sentenced under §2B1.1:

publications/quick-facts/Securities_Fraud_FY22.pdf (last visited October 30, 2023).

[66] United States Sentencing Commission, Quick Facts Securities and Investment Fraud Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Securities_Fraud_FY22.pdf (last visited October 30, 2023).

[67] United States Sentencing Commission, Quick Facts Securities and Investment Fraud Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Securities_Fraud_FY22.pdf (last visited October 30, 2023).

During the last five fiscal years (FY2018-2022), there were 124 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 29 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 122 defendants (98%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 65 month(s) and the median length of imprisonment imposed was 63 month(s).[68]

Courts frequently vary downward in sentencing defendants with loss amounts similar to or far exceeding the loss at issue here. A few illustrative examples follow:[69]

- On October 18, 2023, Mark Schena was sentenced, *following trial* to 96 months[70] despite facing a Guideline of life (Offense Level 43, Criminal History Category I).[71] The government requested 180 months.[72] Schena schemed to defraud mom-and-pop investors, health care insurance programs for the elderly, disabled, poor, and armed forces, and even a non-profit children's hospitals. During the COVID-19 pandemic, he sought to exploit American's fear and line his own pockets, placing the public's health at risk by offering a COVID-19 test that he knew was ineffective. Schena fraudulently billed over $77 million to Medicare, Medicaid, Tricare, and other healthcare insurance programs and bilked over $20 million from investors.[73]
- In August 2023, Sean Novis faced a Guideline of life[74] following trial for defrauding 1000s of victims, many elderly or vulnerable, of $78 million over 13 years.[75] The Court varied downward to sentence him to 90 months.[76]
- In February 2021, the COO of a publicly traded biopharmaceutical company was sentenced after a trial guilty verdict on one count of wire fraud to 12 months in

---

[68]     United States Sentencing Commission, Judiciary Sentencing INformation, available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited October 30, 2023).

[69]     These examples are drawn predominantly from New York and California where nearly half of all investment fraud cases were prosecuted in FY 2022. United States Sentencing Commission, Quick Facts Securities and Investment Fraud Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Securities_Fraud_FY22.pdf (last visited October 30, 2023).

[70]     *United States v. Schena*, 5:20-cr-00425-EJD (N.D. Cal), Dkt 252.

[71]     *Id.*, Dkt 242 at 17-18.

[72]     *Id.* at 1.

[73]     *Id.* at 1.

[74]     *United States v. Novis et al.*, e 2:20-cr-00335-JMA-JMW, Dkt. 123 (E.D.N.Y.).

[75]     *Id.*

[76]     *Id.,* Dkt. 137.

custody in light of the ongoing economic hardship he would face in the future, his general good works, his comparatively lower culpability than his codefendant, and the need for some prison time to address general deterrence; the "[b]izarre, barbaric," and "absurd" Guidelines range was the statutory maximum of 20 years (on an initial range of 262 to 327 months).[77]

- In October 2018, a serial fraudster who committed additional crimes while awaiting sentencing after his fraud guilty plea was sentenced to 72 months' imprisonment where the government calculated a Guidelines sentence of 188 to 235 months and the government requested a sentence of 15 or more years.[78]

Finally, it seems worth noting that some culpable of equal if not worse conduct to Mr. Elder receive only civil sanctions. That's the case with *SEC v. McKinley Mortgage*.[79] In that case, McKinley Mortgage was a private real estate investment fund that raised $66 million between 2012 and 2016 from approximately 300 investors, including several Alaska Native Corporations.[80] It was operated by Tobias, Charles, and Caleb Preston (several of the Prestons lived in Alaska, and Alaskans were defrauded, though this case was prosecuted in the Eastern District of California).[81] The Prestons raised millions of dollars from retail investors—many of whom were unsophisticated—by representing that their promissory notes provided secure, predictable annual returns of between 6% and 8.25% with "preservation of principal" because the investments were to be primarily secured by deeds of trust on real property.[82] This was a lie. Their company had been

---

[77]  *United States v. Taylor*, 1:19-cr-00850-JSR (S.D.N.Y.), Sentencing Tr., Dkt. 157, at 2.
[78]  *See United States v. McFarland*, 1:17-cv-00600 (S.D.N.Y.), Dkt. Nos. 63,68.
[79]  *SEC v. McKinley Mortgage*, 2:18-cv-00616 (E.D. Cal.), Dkt. 1.
[80]  *Id.*
[81]  *Id.*
[82]  *Id.*

consistently losing money. By 2012, it was insolvent and by 2014, it was unable to generate enough revenue to meet its ongoing interest obligations to investors.[83] The Prestons, however, continued to raise money and concealed the company's growing losses by providing investors with false documents stating that the company's assets were earning between 12% and 14%.[84] Meanwhile, the Prestons were improperly using the investor funds they raised.[85] For instance, Tobias Preston improperly used over $17 million in investor money for his benefit, including to purchase a home in Mexico, to make unsecured loans to entities he controlled, and to fund other unrelated personal business ventures.[86] This serious fraudulent activity was only ever prosecuted via SEC enforcement actions and none of the Prestons ever spent a day in custody.

In sum, sentencing Elder to 60 months is not unreasonable and does not create a disparity with others, as half of all similarly situated defendants in the same Guideline range receive a comparable sentence. The average sentence, per JSIN, for someone similarly situated to Elder on the Guideline table, is 65 months. Further, as noted, the average downward variance for investment fraud cases is 48%—or a sentence of 45 months if you calculate from the Guideline of 97 months reached in Mr. Elder's PSR.

### E. A Downward Variance of 60 months Is Appropriate to Provide Restitution to any Victims of the Offense.

---

[83]    *Id.*
[84]    *Id.*
[85]    *Id.*
[86]    *Id.*

The Ninth Circuit has recognized that it is appropriate for a sentencing court to consider how incarceration will impact a defendant's ability to make restitution.[87] A lengthy sentence of imprisonment has the adverse impact of limiting the amount of restitution that can be made to the victims. As the victim impact letters illustrate in this case, some victims are advocating for a sentence that allows Mr. Elder to be released sooner than later so that he can work to pay off restitution. One victim states:

> Simply incarcerating Garrett won't rectify the financial wounds inflicted on us. Instead, I advocate for a solution that focuses on restitution. Garrett has experienced incarceration; what is of paramount importance now is a structured program that emphasizes his responsibility to repay the investors, under constant supervision and monitoring. This restitution-centric approach is a more constructive pathway towards addressing the harm done.[88]

Mr. Elder is young, educated, and has a demonstrated work ethic. While it's unclear whether he can make full restitution in this case, he has the ability, and drive to make consistent restitution payments, which would hopefully offset in some way, the loss the victims have suffered in this case.

---

[87] *United v. Edwards*, 595 F.3d 1004 (9th Cir. 2010)(affirming probationary sentence as "substantively reasonable" for white-collar defendant where district court reasoned it "would best accomplish the goals of the restitution order because it would enable Edwards to earn the money he is required to pay."); *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006)(finding no abuse of discretion in an 8 level downward adjustment where "sentence of probation may have made Defendant better able to provide restitution to the victims of her crime."), *overruled on other grounds United States v. Rangel*, 697 F.3d 795, 803 (9th Cir. 2012).
[88] Dkt. 45 at 16.

A sentence of 60 months strikes the right balance. It holds Mr. Elder accountable, while also allowing him release sooner—under supervision—so that he can work on making restitution to the victims in this case.

## V.    CONCLUSION

No custodial sentence will ever be able to make the victims in this case whole. The sentence proposed by Mr. Elder attempts to strike a fine balance. It's easy to talk about jail sentences in the abstract, but few would want to spend a day incarcerated, let alone five years. Sixty months is a substantial, meaningful punishment that adequately achieves the §3553(a) factors. A term of supervised release with the severe terms of supervision proposed by the government also reinforces the goals of §3553(a).

This sentence recognizes the violation of trust, and the, often, extreme financial harm caused to victims, while it also accounts for the interest in restitution.

DATED at Anchorage, Alaska this 3rd day of November, 2023.

Respectfully submitted,

*/s/ Ben W. Muse*
Ben W. Muse
Assistant Federal Defender

Certificate of Service:
I hereby certify that I electronically filed the foregoing and
any attachments with the Clerk of Court for the United States
District Court for the District of Alaska by using the district's
CM/ECF system on November 3, 2023. All participants in this
case are registered CM/ECF users and will be served by the
district's CM/ECF system. */s/ Ben W. Muse*